IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICH AUREL, #317239                          *

Plaintiff,                                   *

    v.                   *     Civil Action No. ELH-16-1293

WEXFORD HEALTH SOURCES, INC., *et al.* *

Defendants.                                  *

           *****

## MEMORANDUM

On April 28, 2016, plaintiff Mich Aurel,[1] a self-represented inmate incarcerated at the

North Branch Correctional Institution ("NBCI"), filed a civil rights action pursuant to 42 U.S.C.

§ 1983, seeking money damages and continued medical treatment from Wexford Health Sources,

Inc. ("Wexford"), the private health care contractor serving inmates in the Maryland Department

of Public Safety and Correctional Services ("DPSCS").  ECF 1.[2]   In a subsequent Order, I noted

that Aurel was barred from litigating prisoner complaints in forma pauperis under 28 U.S.C.

§ 1915(g).   Nonetheless, I granted his request to proceed without the prepayment of filing fees.

Aurel's case was allowed to proceed for the limited purpose of examining his medical claim

regarding alleged "catastrophic" injuries he sustained from a fall in March 2016 from his upper

bunk.   ECF 3.[3]   Wexford was ordered to file "a show cause response with regard to Aurel's

---

[1] The Maryland Department of Public Safety and Correctional Services ("DPSCS") lists plaintiff as Mich Aurel on its "inmate locator" website.  Although plaintiff was prosecuted as Aurel Mich in the Maryland courts, I will refer to him per the DPSCS designation of Mich Aurel.

[2] All exhibits are referenced by their electronic filing number.

[3] Aurel had also complained that he was denied treatment for polyps in his colon, blood in his stool, and abdominal pain.  He also stated that he has colon cancer.  Verified records filed in his prior consolidated civil rights case, *Aurel v. Warden, et al.*, Civil Action No. ELH-15-1127, indicated that Aurel does not have colon cancer and that he has received constitutionally

medical claims concerning his back and head[.]" *Id.*

Wexford filed the court-ordered response along with a motion for summary judgment, (ECF 4), a legal memorandum (ECF 4-2) (collectively, the "Motion"), and a number of exhibits. Pursuant to the dictates of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), on August 16, 2016, the Clerk of Court informed Aurel of his right to respond to the Motion.  ECF 8.  Aurel filed an opposition to the Motion.  ECF 9.   Wexford then replied.  ECF 10.   Thereafter, Aurel filed another opposition (ECF 11) and his own Affidavit.  ECF 12.  In response, Wexford filed a motion to strike the surreply and the Affidavit.  ECF 13.

The matter is ready for disposition, and no hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2016).  For the reasons that follow, I shall grant Wexford's motion to strike, in part, and I shall grant Wexford's motion for summary judgment.

## I. Background

Aurel alleges that in March of 2016, he suffered a "catastrophic" fall from a top bunk, was hospitalized, but was denied a back brace.  He complains that he has lower back and head pain and has been denied medication and treatment.  Moreover, Aurel complains that his sick-call requests have been destroyed.  ECF 1 at 3.

## II. Standard of Review

Summary judgment is governed by Fed. R. Civ. P. 56(a).  It provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very

---

adequate care for his gastrointestinal problems.  *See* ELH-15-1127, ECF 15; ECF 16 (filed 7/1/16). Therefore, Aurel's claims with regard to his gastrointestinal issues were summarily dismissed, leaving only his medical claims arising from his fall in March 2016.

terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black &. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material

fact precludes summary judgment. *Id.* at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252.  And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because Aurel is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### III. Discussion

### A.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see King v. Rubenstein*, 825 F. 2d 206, 218 (2016).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991)).

In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to his serious medical needs.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  Deliberate indifference to a serious medical need requires proof that,

objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted, objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires a determination as to whether the defendant acted with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40; *King*, 825 F.3d at 218. As the *King* Court recently reiterated, "The requisite state of mind is . . . 'one of deliberate indifference to inmate health or safety.'" *King*, 825 F.3d at 219 (citation omitted). Although this "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* (quoting *Farmer*, 511 U.S. at 835).

In order "[t]o show an Eighth Amendment violation, it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178. In other words, deliberate indifference requires a showing that the defendant disregarded a substantial risk of harm to the prisoner. *Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001).

The Fourth Circuit has explained:  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."  *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997).  The Court has also said:  "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'"  *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) (quoting *Farmer* 511 U.S. at 844).  However, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious."  *Brice*, 58 F.3d at 105; *see Makdessi v. Fields*, 789 F.3d 126, 133, (4th Cir. 2015).  And, "[a] prison official's subjective actual knowledge [of a risk] can be proven through circumstantial evidence. . . ."  *Id.* at 134.

The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.  Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.*; *see also Young*, 238 F.3d at 575.  In *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999), the Court said: "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it. . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences. . . .  To lower this threshold would thrust federal courts into the daily practices of local police departments." Moreover, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Even if the requisite subjective knowledge is established, an official may still avoid

liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000 (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

Notably, "[a] prisoner's disagreement with medical providers about the proper course of treatment does not establish an Eighth Amendment violation absent exceptional circumstances." *Lopez v. Green*, PJM-09-1942, 2012 WL 1999868, at *2-3 (D. Md. June 4, 2012) (citing *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)); *see Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977). Moreover, "any negligence or malpractice on the part of … doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Although the Eighth Amendment proscribes deliberate indifference to a prisoner's serious medical needs, it does not require that a prisoner receive medical care by a provider of his choice. Rather, the right to medical treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977).

## B.

Wexford's materials indicate that Aurel is a 46-year old male with a medical history significant for hypothyroidism,[4] asthma, constipation, hypertrophy of prostate, cough,

---

[4] Hypothyroidism, also called underactive thyroid, is when the thyroid gland doesn't make enough thyroid hormones to meet the body's needs. *See* https://www.niddk.nih.gov/health-information/health-topics/endocrine/hypothyroidism.

hyperlipidemia, and esophageal reflux.  ECF 4-4, Affidavit of Robustiano Barrera, M.D.[5]   On February 3, 2016, Aurel submitted a sick-call slip complaining that he had pain in his lower back, hips, and upper thighs.  ECF 4-3 at 2.   On March 17, 2016, he submitted two sick-call slips, one of which claimed that he had a "weakness" and fatigue.  *Id*. at 3.[6]  On March 19, 2016, Aurel was seen by Nurse Dawn Hawk for his complaint that he needed a bottom bunk for ankle pain.  *Id*. at 5-6.  On March 21, 2016, Aurel was found lying on the floor of his housing unit.  He stated that he fell from the top bunk and was hurt in the right hip area.  *Id*. at 7-8.  He was promptly examined by Marboob Ashraf, M.D.  ECF 4-3 at 7.

Aurel's right leg was found to be externally rotated and unable to move either in flexion or extension.  Further, his right leg was swollen, showed shortening as compared to his left leg, and could not move towards the adduction or abduction due to severe pain.  In addition, his right leg was unable to bear any weight, and moderate swelling was noted.  ECF 4-3 at 7-11.  Aurel's vital signs were taken.  No objective injuries to the face or head were observed, nor did Aurel raise complaints of headache or injury to the head.  *Id*.

Aurel was transported by ambulance to the Emergency Department at Western Maryland Regional Medical Center for an evaluation. The hospital reported that Aurel had a minor contusion to his back and hip, with no fractures.   ECF 4-3 at 12.

Upon Aurel's return to the NBCI infirmary, he was observed ambulating independently with a steady gait and had no symptoms of acute distress.  Dr. Barrera prescribed Naprosyn, but

---

[5] Dr. Barrera is employed by Wexford to provide medical services to inmates in the DPSCS.  ECF 44-4 at ¶ 1.

[6] The first sick-call slip for March 17, 2016, is indecipherable.  ECF 4-3 at 3.  Wexford alleges that the sick-call slip concerned Aurel's complaint that he needed to see a physician's assistant for a bottom bunk.  ECF 4-2, Memorandum of Law at 2.

he declined to order Vicoprofen.[7]  Aurel was seen in the infirmary by Nurse Hawk, who noted the physician's order for Naprosyn.[8]  *Id*. at 12-13.   On March 22, 2016, he was provided thirty Naprosyn tablets.  *Id*., p. 14.

Dr. Ashraf examined Aurel on March 22, 2016.   He was noted to have a left hip contusion, but was able to walk, although with difficulty, due to pain in the left hip area.  *Id*. at 15-17.   Aurel was not assessed as needing a bottom bunk or narcotic pain medication as his pain was within control.   It was noted that Aurel had a history of creating a medical complaint for secondary gain and providers were cautioned to observe Aurel and to justify treatment if it was found to be necessary.   ECF 4-4, Aff. of Dr. Barrera.   Aurel was ordered to refrain from work activities, gym, or sports for one week and ordered on bed rest for a 72-hour period.   ECF 4-3 at 15, 18-19.

Nurse Ricki Moyer saw Aurel on March 29, 2016.   Aurel sought an extension of his feed-in status, complaining that he could not walk fast enough to get to the chow hall for food.   *Id*. at 20-21.   He also requested a back brace, stating that the last provider had indicated that one would be ordered.   Aurel's evaluation revealed no symptoms of acute distress, his respiration was even and unlabored, he ambulated with a steady gait, and he was able to get up and down from the examination table with ease.   He was not assessed to need further feed-in status and was advised that inmates with crutches and canes can ambulate to the chow hall in time and he simply needed to move faster.   Aurel was further informed that as the hospital report revealed no acute injuries

---

[7] Vicoprofen is a combination of Hydrocodone and Ibuprofen.  Hydrocodone is an opioid pain medication.   An opioid is sometimes called a narcotic.  Ibuprofen is a nonsteroidal anti-inflammatory drug  ("NSAID"). This medicine works by reducing substances in the body that cause pain, fever, and inflammation.  *See* https://www.drugs.com/vicoprofen.html.

[8] Naprosyn is a nonsteroidal anti-inflammatory drug.  *See*  https://www.drugs.com/ naprosyn.html.

other than a contusion, there was no need for a back brace.  He otherwise raised no complaints of headache or head injury.  ECF 4-3 at 20-21.

On April 13, 2016, Aurel was seen by Nurse Amy Booth, for his complaints of lower back pain.  A muscle rub ointment and Motrin were ordered for his back pain and Aurel was advised to increase his exercise to help loosen his lower back muscles.  *Id.* at 22-24.

Nurse Moyer again saw Aurel on April 26, 2016.  He indicated that he had severe lower back pain and needed a bottom bunk assignment.  Upon examination, he was found to be alert and oriented, had no symptoms of acute distress, his vital signs were within normal limits, his respiration was even and unlabored, he ambulated with a steady gait, and he was able to easily get up and down from the examination table.  He was advised to increase his fluid intake, as well as his activity level, and to continue his current medications.  *Id.* at 25-26.

On May 5, 2016, Aurel was seen by Nurse Michael Klepitch for his complaint of back pain.  Aurel indicated that would like to try Baclofen for a short period of time to treat his back pain.  It was observed that he was being treated for his back pain.  Aurel was referred to a provider.  *Id.* at 27-28.  On May 11, 2016, Aurel was seen by Dr. Ashraf in the Chronic Care Clinic for his hypothyroidism and asthma.  *Id.* at 29-31.  He did not express any complaints of headaches, back pain, or head pain.  Aurel's muscle rub ointment was renewed.  *Id.*

Nurse Klepitch saw Aureal on May 17, 2016, for his complaint of lower back pain.  He was observed to ambulate well and was able to sit on the examination table.  Aurel was found to be forcing a limp to his gait.  He was referred to a provider.  ECF 4-3 at 32-33.

On June 2, 2016, Aurel was seen by Nurse Amy Booth for his complaints of lower back pain and the need for a refill of fiber packs and an antifungal cream.  He further claimed he had not received Motrin, prescribed in April of 2016.  Aurel was referred to a provider.  *Id.*  Three weeks later, on June 22, 2016, Aurel was given 40 pills of 200 mg of Motrin.  *Id.* at 34-36.

Wexford maintains that Aurel continues to be seen in the CCC and has access to the medical staff through the sick-call process.  ECF 4-4, Aff. of Dr. Barrera.

In his oppositions and supporting affidavit, Aurel again complains of his "catastrophic" fall.  He also discusses his other alleged medical problems related to his throat, thyroid, asthma, colon, stomach, ulcer, prostate, abdominal pain, and pain to his left ankle from an alleged twelve-year old fracture.  ECF 9; ECF 11; ECF 12.

### C.

Wexford has filed a motion to strike Aurel's second opposition and supporting Affidavit, claiming that such filings constitute a surreply, which is not permitted under Local Rule 105.2, without permission from the court.  ECF 13.  Wexford further contends that Aurel's claims concerning his throat, thyroid, asthma, abdominal pain, colon, stomach, ulcer, prostate, and pain to his left ankle concern amended issues that should not be addressed in this case.  *Id.*

Given Aurel's pro se status, and the court's disposition of the Motion, the court shall, in its discretion, deny the motion to strike.  However, the court will not consider medical issues unrelated to plaintiff's fall.

### D.

Given the court's limited examination of Aurel's medical concerns arising from the fall from his bunk in March of 2016, I am satisfied that Aurel does not present an Eighth Amendment violation.  The record reveals that Aurel was treated for his fall-related injuries.  He was immediately taken to a local hospital for diagnosis and treatment.  He was diagnosed with a minor contusion to the back and hip, but no fractures were found.  Thereafter, Aurel raised medical complaints related to his fall, he was routinely seen and evaluated by nurses and physicians.  His assessments were consistently unremarkable, his gait was found to be normal, he

was able to ambulate, and he was observed to be capable of moving onto and down from the examination table, without difficulty.

An Eighth Amendment violation cannot be made given the record presented in this case. Summary judgment will be entered in favor of defendant Wexford in a separate Order to follow.


Date: October 18, 2016            _____/s/_____
                                  Ellen L. Hollander
                                  United States District Judge